1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11

12   SACRAMENTO METROPOLITAN CABLE         No. 2:18-CV-00500 WBS EFB
     TELEVISION COMMISSION,
13                                         No. 2:18-cv-01212 WBS EFB
                  Plaintiff,
14                                         MEMORANDUM AND ORDER RE:
          v.                               CROSS MOTIONS FOR SUMMARY
15                                         JUDGMENT
     COMCAST CABLE COMMUNICATIONS
16   MANAGEMENT, LLC,

17                Defendant.

18

19                              ----oo0oo----

20        Plaintiff Sacramento Metropolitan Cable Television

21   Commission ("SMCTC" or "plaintiff") brought this action against

22   Defendant Comcast Cable Communications Management, LLC ("Comcast"

23   or "defendant") claiming that (1) Comcast violated California

24   Public Utility Code §§ 5840, 5860, and 5870; (2) Comcast breached

25   its contract with plaintiff; (3) Comcast unjustly enriched itself

26   at plaintiff's expense; and (4) that it is entitled to

27

28                                    1

declaratory relief. (Compl. (Docket No. 1).)[1]  This court has
jurisdiction of this action pursuant to 28 U.S.C. § 1332 because
there is complete diversity of citizenship between the parties
and the amount in controversy exceeds $75,000, exclusive of
interest and costs.

Each claim of the Complaint is predicated on the theory
that Comcast underpaid annual cable "franchise fees" and Public,
Educational, and Governmental ("PEG") fees owed to plaintiff
under California's Digital Infrastructure and Video Competition
Act of 2006 ("DIVCA"), Cal. Pub. Util. Code § 5800, et seq.  The
claims involve six forms of alleged underpayments based on two
audits covering the periods of 2013-2014 and 2015-2016.  Comcast
moves for summary judgment on each of the six forms of alleged
underpayments.  (Def.'s Mot. for Summ. J.) (Docket No. 42; Docket
No. 34.) SMCTC moves for partial summary judgment on three of the
six forms of alleged underpayments and as to whether Comcast's
unilateral deductions prior to paying SMCTC are permitted under
DIVCA and applicable federal law.[2]  (Pl.'s Mot. for Partial Summ.
J. ("Pl.'s Mot. for Summ. J.") (Docket No. 49; Docket No. 41.)

---

[1]     All docket references refer to the docket entries in
Case No. 2:18-cv-00500.  These two cases were consolidated
pursuant to Federal Rule of Civil Procedure 42(a)(2) for all
purposes and the parties agreed that the main case number would
be 2:18-cv-500 WBS EFB. (Docket No. 20.)

[2]     SMCTC does not move for summary judgment as to launch
incentives, multi-service fees, and customer credits for missed
installation/activation appointments.  (See generally Pl.'s Mot.
for Summ. J.)  Although SMCTC did not initially move for summary
judgment on tower rental fees, they agree that there are no
material issues of disputed facts on this claim and that it is
appropriate for disposition on summary judgment. (Pl.'s Opp'n to
Def's Mot. for Summ. J. at 1, 17.) (Docket No. 54.)

1   I.   Facts & Procedural Background

2            Plaintiff SMCTC is a joint powers agency with certain

3   regulatory authority over cable services in Sacramento County.

4   (Def.'s Statement of Undisputed Facts at ¶ 1 ("Def.'s SUF")

5   (Docket No. 44).)   The members of SMCTC are the County of

6   Sacramento and the cities of Sacramento, Galt, Folsom, Citrus

7   Heights, Rancho Cordova and Elk Grove.   (Pl.'s Statement of

8   Undisputed Facts at ¶ 4 ("Pl.'s SUF")) (Docket No. 49-1.)   In

9   California, cable franchises were historically issued by local

10  government entities, such as SMCTC, to cable operators.   (Id. at

11  ¶ 4.)   DIVCA replaced that regime with a statewide franchising

12  system managed by the California Public Utilities Commission

13  ("CPUC").   (Id. at ¶ 6.)   As of 2011, Comcast has operated its

14  cable systems in California pursuant to a CPUC-issued franchise.

15  (Id. at ¶ 7.)   Comcast, either directly or through its

16  affiliates, provides video service under a state-issued video

17  franchise within SMCTC's jurisdiction.   (Id. at ¶ 8.)

18            Under the 1984 Federal Cable Act, ("Cable Act"), 47

19  U.S.C. § 521, et seq., franchising authorities may require a

20  cable operator to pay franchise fees up to five percent of its

21  annual "gross revenues . . . . from the operation of the cable

22  system to provide cable service."   47 U.S.C. § 542(b).   Franchise

23  fees are "passed through" and paid by cable subscribers as part

24  of their monthly cable bills.   47 U.S.C. § 542(c).   Any fees

25  assessed by franchising authorities for PEG channels and capital

26  support are also "passed through" to cable subscribers.   (Id.)

27            DIVCA imposes an annual "User Fee" on cable operators

28  as a condition to obtaining a franchise ("CPUC User Fee").   See

1    Cal. Pub. Util. Code § 441.  DIVCA additionally imposes the

2    payment of franchise fees, which are paid to municipalities for

3    the use of the public rights-of-way in their jurisdictions.  See

4    Cal. Pub. Util. Code § 5860(a).  Unless a locality specifically

5    adopts a lower fee, California Public Utilities Code section

6    5840(q)(1) requires all DIVCA franchisees to pay a franchise fee

7    equal to the applicable local agency equal to five percent of its

8    "gross revenues."  (Pl.'s SUF at ¶ 14.)  Neither SMCTC nor its

9    member agencies have adopted a lower fee.  (Id.)  DIVCA

10   authorizes franchising authorities to implement a PEG fee of up

11   to one percent of cable service revenues, which is also paid to

12   localities.  See Cal. Pub. Util. Code § 5870(n).  SMCTC and its

13   member agencies have adopted ordinances to activate a one percent

14   PEG fee on DIVCA franchisees, such as Comcast.  (Pl.'s SUF at ¶

15   18.)  State franchise holders are authorized to identify and

16   collect both the franchise fees and PEG fees as separate line

17   items on a subscriber's bill.  See Cal. Pub. Util. Code. §§

18   5860(j); 5870(o).

19        A state franchise holder is required to remit franchise

20   and PEG fees to a local entity on a quarterly basis.  See Cal.

21   Pub. Util. Code §§ 5860(h), 5870(m).  A local entity may examine

22   a franchise holder's business records once a year to ensure

23   payment of franchise fees in accordance with Section 5860 of

24   DIVCA.  See Cal. Pub. Util. Code § 5860(i).  In 2016 and 2017,

25   SMCTC retained Ashpaugh & Sculco, CPAs, PLC ("Ashpaugh & Sculco")

26   to perform an audit of franchise fees and PEG fees Comcast paid

27   for the 2013–2014 and 2015–2016 periods.  (Pl.'s SUF at ¶¶ 23–

28   28.)  These audits reported that Comcast had underpaid franchise

4

fees and PEG fees to SMCTC in both audit periods in the amounts of $682,911 for 2013-14 and $828,590 for 2015-16.  (Id. at ¶¶ 25, 28.)

The court previously dealt with certain aspects of this dispute in Comcast of Sacramento I, LLC. v. Sacramento Metropolitan Cable Television Commission, Case No. 2:16-cv-01264 WBS EFB, 250 F. Supp.3d 616, 618-27 (E.D. Cal. 2017)("SMCTC I"). In that case, Comcast sued SMCTC and alleged causes of action for conversion and "common count" after SMCTC withheld Comcast's franchise security deposit following a dispute over the amount of fees Comcast was required to pay SMCTC under DIVCA.  Id. at 619. SMCTC raised a defense of offset, claiming that an audit for the period of 2011-2012 established underpayments of franchise and PEG fees.  Id. at 620.  The court ruled that PEG fees did not fall within the definition of "gross revenue" for purposes of calculating franchise fees because it fell within an exception stated in Cal. Pub. Util. Code § 5860(e).  Id. at 628.  The court also found that the CPUC User Fee was a "fee of general applicability" excluded from franchise fees under the Federal Cable Act.  Id. at 626.

Both SMCTC and Comcast appealed from the judgment in SMCT I.  See Comcast of Sacramento I, LLC v. Sacramento Metropolitan Cable Television Commission, 923 F.3d 1163, 1165-1172 (9th Cir. 2019) ("SMCTC II").  The Ninth Circuit held that Comcast's attempt to recover its security deposit was barred by Section 555a(a) of the Federal Cable Act, which limits relief in suits against franchising authorities to injunctive and declaratory relief.  See id. at 1171.  While the case was on

appeal, SMCTC initiated the present consolidated lawsuits against Comcast based on the two more recent audits referenced in the Complaints.[3]

---

[3]   The court takes judicial notice of the provisions of the SMCTC members city/county codes and the SMCTC Resolution provided in plaintiff's request for judicial notice. (Request for Judicial Notice 1-8 ("Pl.'s RJN") (Docket No. 50).)  See Tollis, Inc. v. Cty. of San Diego, 505 F.3d 935, 938 n. 1 (9th Cir. 2007) ("Municipal ordinances are proper subjects for judicial notice.").  Defendant has not objected to items listed in plaintiff's Request for Judicial Notice 9-11, 13-15, 17, 19, and 21.  These requests consist of defendant's franchise application, franchise certificates, the parties' engagement agreements for analysis of franchise and PEG fees, deposition excerpts by defendant's witness Lee-Ann Peling, and defendant's audit responses.  Accordingly, the court will take judicial notice of these documents.  Defendant objects to the items listed in plaintiff's Request for Judicial Notice 12, 16, 18, 20, and 21 on the grounds that the contents are hearsay and not subject to judicial notice under Federal Rule of Evidence 201.  These documents consist of deposition excerpts from the deposition of Robert Allen Davison and Steven M. Detrick, the 2013-2014 audit report, the 2015-2016 audit report, and the corrected 2015-2016 audit report.  Because the court did not rely on these documents for the truth of the matter asserted, the court will take judicial notice of these documents as well.

Defendant requests that the court take judicial notice of five documents.  (Request for Judicial Notice ("Def.'s RJN") (Docket No. 46).)  These documents are: (1) this court's April 5, 2017 order on the cross-motions for summary judgment in Case No. 2:16-cv-01264 titled Comcast of Sacramento I, LLC v. Sacramento Metropolitan Cable Television Commission, 250 F. Supp. 3d 616, 626 (E.D. Cal. 2017) ("SMCTC-I"); (2) the Ninth Circuit Court of Appeal's Opinion filed on May 8, 2019 in SMCTC-II, 923 F.3d 1163 (9th Cir. 2019); (3) this court's October 1, 2019 judgment in Case No. 2:16-cv-01264 entered pursuant to the Ninth Circuit's decision; (4) the operative complaint in the instant case (Case No. 2:18-cv-00500), which contains SMCTC's 2013-2014 audit reports as attachments, and (5) the operative first amended complaint in the instant case (Case No. 2:18-cv-01212), which contains SMCTC's 2015-2016 audit report.  Plaintiff has not objected.  Accordingly, the court will take judicial notice of the items listed in defendant's Request for Judicial Notice in its entirety.

1  II.  <u>Discussion</u>

2          Summary judgment is proper "if the movant shows that

3  there is no genuine dispute as to any material fact and the

4  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

5  P. 56(a).  A material fact is one that could affect the outcome

6  of the suit, and a genuine issue is one that could permit a

7  reasonable jury to enter a verdict in the non-moving party's

8  favor.  <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1986).

9          The party moving for summary judgment bears the initial

10  burden of establishing the absence of a genuine issue of material

11  fact and can satisfy this burden by presenting evidence that

12  negates an essential element of the non-moving party's case.

13  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

14  Alternatively, the movant can demonstrate that the non-moving

15  party cannot provide evidence to support an essential element

16  upon which it will bear the burden of proof at trial.  <u>Id.</u>  Where

17  "the case turns on a mixed question of fact and law and the only

18  disputes relate to the legal significance of undisputed facts,

19  the controversy collapses into a question of law suitable to

20  disposition on summary judgment."  <u>Thrifty Oil Co. v. Bank of Am.</u>

21  <u>Nat'l Tr. & Sav. Ass'n</u>, 322 F.3d 1039, 1046 (9th Cir. 2003).

22  "Where the record taken as a whole could not lead a rational

23  trier of fact to find for the non-moving party, there is no

24  genuine issue for trial."  <u>Matsuhita Elec. Indus. Co. v. Zenith</u>

25  <u>Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Any inferences drawn from

26  the underlying facts must, however, be viewed in the light most

27

28

1   favorable to the party opposing the motion.  See id. [4]

2        A.   PEG Fees

3            Section 5870(n) of the California Public Utilities Code

4   states that "a local entity may, by ordinance, establish a fee to

5   support PEG channel facilities."  Cal. Pub. Util. Code § 5870(n).

6   Each SMCTC member locality has imposed a PEG fee.[5]  Comcast, in

7   turn, passes the PEG fee on to its subscribers, who pay the fee

8   "as a separate line item on [their] regular bill."  Cal. Pub.

9   Util. Code § 5870(o).  Comcast does not keep any portion of the

10  PEG fees that it bills to subscribers and forwards those PEG

11  payments to SMCTC.  (Pl.'s Resp. to Def.'s SUF at ¶ 15 (Docket

12  No. 54-2).)  The parties dispute whether Comcast must include PEG

13  fees in its "gross revenue" for purposes of calculating its state

14  franchise fees.  The dispute centers over the interpretation of

15  ────────────────────

16        [4]   Comcast makes several evidentiary objections to the
    Declaration of Robert Davison and its attachments, the deposition
17  excerpts of Garth Ashpaugh, and the expert report prepared by Mr.
    Ashpaugh attached to the Declaration of Mark Velasquez (Docket
18  No. 54-1) on the grounds that the statements by Mr. Davison and
    Mr. Ashpaugh lack foundation, are hearsay, speculative, and
19  irrelevant.  (See Docket No. 53-1; Docket No. 56-1.)  The Ninth
    Circuit has established that "to survive summary judgment, a
20  party does not necessarily have to produce evidence in a form
    that would be admissible at trial, as long as the party satisfies
21  the requirements of Federal Rule of Civil Procedure 56."  Fraser
    v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003.)  Moreover,
22  "[a]s a practical matter, the court finds this entire exercise of
    considering evidentiary objections on a motion for summary
23  judgment to be futile and counterproductive."  Burch v. Regents
    of University of California, 433 F.Supp.2d 1110, 1122 (E.D. Cal.
24  2006.)  Accordingly, if Comcast wishes to raise these evidentiary
    objections, it may do so at trial.
25

26        [5]   See, e.g., Sacramento Cty. Code § 5.50.977; Citrus
27  Heights Mun. Code § 90-183; Elk Grove Mun. Code § 5.50.010;
    Folsom Mun. Code § 5.50.010; Galt Mun. Code § 5.55.030; Rancho
28  Cordova Mun. Code § 5.75.800; Sacramento City Code § 5.28.2670.

California Public Utilities Code § 5860 ("section 5860").

Section 5860(d) defines "gross revenue" for purposes of state franchise fees as:

> [A]ll revenues actually received by the holder of a state franchise, as determined in accordance with generally accepted accounting principles, that is derived from the operation of the holder's network to provide cable or video service within the jurisdiction of the local entity, including . . . [a]ll charges billed to subscribers for any and all cable service or video service provided by the holder of a state franchise, including all revenue related to programming provided to the subscriber, equipment rentals, late fees, and insufficient fund fees.

Cal. Pub. Util. Code § 5860(d)-(d)(1).

Section 5860(e)(6) contains an exception to the above provision for "[a]mounts billed to, and collected from, subscribers to recover any tax, fee, or surcharge imposed by any governmental entity on the holder of a state franchise, including, but not limited to, sales and use taxes, gross receipts taxes, excise taxes, utility users taxes, public service taxes, communications taxes, and any other fee not imposed by this section."  See Cal. Pub. Util. Code § 5860(e)(6).

Comcast argues that the payments it collects from subscribers to pay PEG fees fit within this exception because they are imposed by section 5870 and thus are not part of "gross revenue" as defined in Section 5860(d).  (Def.'s Mot. for Summ. J. at 7.)  SMCTC contends that section 5860(e)'s exception does not apply because PEG fees are imposed pursuant to section 5860(c).  (Pl.'s Mot. for Summ. J. at 13.)  Section 5860(c) states that no local entity may demand any additional fees or charges from the holder of a state franchise "based solely on its

1   status as a provider of video or cable services other than as set

2   forth in this division. . ."   See Cal. Pub. Util. Code § 5860(c).

3   SMCTC argues that "this division" means Division 2.5 of the

4   California Public Utilities Code (i.e. all of DIVCA), and that

5   5860(c), through its incorporation of all of DIVCA, is the

6   section that effectively authorizes PEG fees.  (Pl.'s Mot. for

7   Summ. J. at 13.)

8           Comcast's position is more persuasive.  Under the plain

9   language of Section 5860(e)(6), "gross revenue" does not include

10  revenues from "any. . . fee not imposed by [Section 5860]."  Cal.

11  Pub. Util. Code § 5860(e)(6).  PEG fees are authorized under

12  California Public Utilities Code section 5870 ("section 5870").

13  The use of the term "this division" in Section 5860(c) does not

14  displace the legislature's use of the term "this section" in

15  5860(e)(6), which specifically addresses which fees should be

16  included and excluded from "gross revenue" when calculating

17  franchise fees.  If the legislature had meant "this division" in

18  Section 5860(e)(6), it would not have said "this section."  It is

19  improper to "assume that our Legislature chose. . . an indirect

20  route to convey an important and easily expressed message."

21  Debbie Reynolds Prof. Rehearsal Studios v. Superior Court, 25

22  Cal. App. 4th 222, 232 (2nd Dist. 1994).

23          SMCTC also points out that PEG fees were not

24  specifically enumerated in the exception for "gross revenue" laid

25  out in 5860(e).  (Pl.'s Mot. for Summ. J. at 13-14.)  They

26  contend that the canon of esjusdem generis (meaning "of the same

27  kind") dictates that the PEG fees should be not be included

28  because the list of items enumerated are all generally applicable

1    taxes and the PEG fee is not a generally applicable tax.  (Id. at

2    14.)  However, Section 5860(e)(6) treats "fees", "taxes", and

3    "surcharges" the same in enumerating the exclusions from "gross

4    revenue."  See Cal. Pub. Util. Code § 5860(e)(6) (excluding from

5    revenues "amounts billed to, and collected from, subscribers to

6    recover any tax, fee, or surcharge, imposed by any governmental

7    entity on the holder of a state franchise. . .").  Most

8    critically, the legislature chose to use the broad catch-all "any

9    other fee not imposed by this section", and made no limitations

10   as to the type of fees that would be encompassed.  Therefore, the

11   doctrine of esjusdem generis appears to confirm that the

12   exclusion from "gross revenue" applies broadly to "any other

13   fees" not imposed by Section 5860, regardless of whether they are

14   styled as a "fee" or a "tax."

15          SMCTC additionally argues that PEG fees do not fall

16   within the exception in section 5860(e) because the PEG fees are

17   imposed by DIVCA, not local government entities.  (Pl.'s Mot. for

18   Summ. J. at 10.)  However, while section 5870(n) authorizes

19   localities to establish a fee to support PEG channel facilities,

20   it does not mandate that localities do so.  See Cal. Pub. Util.

21   Code § 5870(n).  Instead, localities may decide whether they wish

22   to pass an ordinance to recover a PEG fee and determine the

23   amount of the fee (not to exceed 1 percent of the holder's "gross

24   revenue" if no fee existed before the implementation of DIVCA or

25   not to exceed 3 percent of the holder's "gross revenue" if a PEG

26   fee in excess of 1 percent was already being charged before

27   DIVCA.)  See id.

28          The California Attorney General Opinion that SMCTC

relies on for its position is inapposite.  The Attorney General Opinion relates to whether PEG fees were taxes requiring voter approval under California law.  See 99 Cal. Op. Att'y Gen. 1 (2016) at *5.  Although Attorney General Opinions are entitled to "great weight", Napa Valley Educators' Association v. Napa Valley Unified School District, 194 Cal. App. 3d 243, 251 (1st Dist. 1987),  the Opinion cited by SMCTC focused on whether a local entity which passed an ordinance to collect the public access fee was imposing a charge on an individual or entity that would not be otherwise obligated to pay such a fee.  See 99 Cal. Op. Att'y Gen. 1 at *5.  Because DIVCA mandates that franchise applicants must provide both public access channels and any required funding under Cal. Pub. Util. Code § 5870, the Attorney General concluded that the PEG fees were not a tax.  Id.  However, the Attorney General did not analyze or mention whether PEG fees are excluded from "gross revenues" under Section 5860(e)(6), and did not address the flexibility that municipalities have in determining whether to impose a PEG fee and in what amount.  Accordingly, the court finds that the opinion is not instructive here.  The court finds as a matter of law that it is the municipalities who impose a PEG fee, not DIVCA itself.

SMCTC finally argues that the PEG fees must be included in calculating franchise fees because the legislature stated that it was their intent that "the definition of gross revenues in this division shall result in local entities maintaining their existing level of revenue from franchise fees."  Cal. Pub. Util. Code § 5810(a)(4)(d).  ["S]tatements of the intent of the enacting body contained in a preamble, while not conclusive, are

1    entitled to consideration."  People v. Canty, 32 Cal. 4th 1266,

2    1280 (2004).  However, California Code of Civil Procedure § 1859

3    provides that "when a general and a particular provision are

4    inconsistent, the latter is paramount to the former" and "a

5    particular intent will control a general one that is inconsistent

6    with it."  Cal. Code. Civ. P. § 1859.  As such, the generalized

7    intent of the legislature set forth in the preamble cannot

8    override the specific exclusions from "gross revenue" set forth

9    in section 5860(e)(6).

10         Accordingly, the court finds as a matter of law that

11   PEG fees do not constitute "gross revenue" under section 5860(d)

12   and will grant summary judgment in Comcast's favor on this claim.

13        B.   CPUC User Fee

14         Comcast argues that it must reduce the state franchise

15   fee it is obligated to pay to SMCTC to stay within the five

16   percent cap on franchise fees imposed by the Federal Cable Act,

17   47 U.S.C. § 541, et seq., because the CPUC User Fee is a

18   "franchise fee" under the Act.  (Def.'s Mot. for Summ. J. at 10.)

19   SMCTC disagrees, contending that the CPUC user fee does not count

20   toward the Act's five percent cap because it is not a "franchise

21   fee."  (Pl.'s Mot. for Summ. J. at 6.)

22         47 U.S.C. § 542(b) of the Federal Cable Act states that

23   "[f]or any twelve-month period, the franchise fees paid by a

24   cable operator with respect to any cable system shall not exceed

25   5 percent of such cable operator's gross revenues derived in such

26   period from the operation of the cable system to provide cable

27   services."  47 U.S.C. § 542(g)(1) defines "franchise fee" as

28   including "any tax, fee, or assessment of any kind imposed by a

1   franchising authority or other governmental entity on a cable

2   operator . . . solely because of [its] status as such."  47

3   U.S.C. § 542(g)(1).  Section § 542(g)(2) excludes from this

4   definition "any tax, fee, or assessment of general applicability

5   (including any such tax, fee, or assessment imposed on both

6   utilities and cable operators or their services but not including

7   a tax, fee, or assessment which is unduly discriminatory against

8   cable operators)."  DIVCA separately imposes annual franchise

9   fees of five percent of a cable operator's cable service

10  revenues, which are paid to each locality where it operates its

11  cable system pursuant to a state franchise.  See Cal. Pub. Util.

12  Code § 5860(a) (requiring the "holder of a state franchise" to

13  "remit to the local entity a state franchise fee" where it

14  "offers video service").

15          The CPUC also imposes an annual User Fee "to be paid by

16  an applicant or holder of a state franchise pursuant to [DIVCA]

17  (commencing with Section 5800)."  Cal. Pub. Util. Code § 441.

18  "The annual fee shall be established to produce a total amount

19  equal to that amount established in the authorized commission

20  budget for the same year, including adjustments for increases in

21  employee compensation, other increases appropriated by the

22  Legislature, and an appropriate reserve to carry out the

23  provisions of [DIVCA]."  Id.  The CPUC User Fee applies not only

24  to cable operators, but to all "holders of a state franchise"

25  that authorizes the "operation of any network in the right-of-way

26  capable of providing video service to subscribers" ("video

27  franchise holders").  See id. at § 441, 5830(f)-(h).  "[I]t is

28  possible to qualify for the [CPUC User Fee] without being a cable

1   operator."   Cty. of Los Angeles v. Time Warner NY Cable LLC, No.

2   CV-12-06655 SJO (JCx), 2013 WL 12126774, at *2 (C.D. Cal. July 3,

3   2013).

4            This court previously ruled that the CPUC User Fee is

5   not a franchise fee within the meaning of 47 U.S.C. § 542 for two

6   reasons.   See SMCTC-I, 250 F. Supp. 3d at 624-25.   First, because

7   the CPUC User Fee also applies to non-cable operating video

8   franchise holders, it is not imposed on cable operators "solely

9   because of their status as such" under 47 U.S.C. 542(g)(1).   See

10  id.   Second, because the User Fee is also imposed on non-cable

11  operators, the court found that it is a fee of "general

12  applicability" under 47 U.S.C. § 542(g)(2).   See id. However,

13  Comcast contends that a recent order by the Federal

14  Communications Commission ("FCC") clarifies the proper scope of

15  franchise fees under 47 U.S.C. § 542 and confirms that the CPUC

16  user fee is a "franchise fee" subject to the federal 5% cap.   See

17  In the Matter of Implementation of Section 621(a)(1) of the Cable

18  Commc'ns Policy Act of 1984 As Amended by the Cable Television

19  Consumer Prot. & Competition Act of 1992 ("Section 621 Order"),

20  34 FCC Rcd. 6844, at ¶¶ 80-94 (Aug. 2, 2019).

21           The Section 621 Order emphasizes that Congress defined

22  the term "franchise fee" broadly to "limit the imposition of any

23  tax, fee, or assessment of any kind — including fees purportedly

24  for provision of non-cable services for access to, use of, or the

25  value of the rights of way – to five percent of the cable

26  operator's revenue from cable services."   Id. at ¶ 90.   A local

27  government entity cannot "end-run the cap by imposing fees for

28  access to any public right of way within the franchise area or in

instances of overlapping jurisdiction." Id.  The FCC states that 47 U.S.C. § 622 envisions that fees imposed on cable operators for access to the rights of way in their capacity as franchisees is a fee imposed on a cable operator "solely because of their status as such." Id. at ¶ 92.  Understood in this manner, the FCC states that "any assessment on a cable operator for constructing, managing, or operating its cable system in the rights-of-way is subject to the five percent cap" even if "other non-cable providers. . . are subject to the same or similar access fees." Id. at ¶ 92.  This is because the definition of "franchise fee" in section 622(g)(1) centers on why the fee is imposed on a cable operator, i.e. "solely because of [its] status" as a franchisee, and not to whom the fee is imposed. (Id.)  The FCC states that generally-applicable taxes are distinct and their "validity must be shown, at least in part, by their application to broader classes of entities or citizens beyond providers of cable and non-cable communications services." (Id.)

Comcast contends that, although the CPUC User Fee at issue in this case has a different name and is imposed under a different section of DIVCA from the fees expressly labeled as "franchise fees", both are "monetary assessments for Comcast's right to operate its cable system in California and therefore constitute franchise fees subject to the federal 5% cap." (Def.'s Mot. for Summ. J. at 14.)  Comcast likewise argues that the FCC's order precludes any argument that the CPUC User Fee is a "fee of general applicability" because the CPUC User Fee "applies only to video franchise holders pursuant to a specific

1   enabling statute, as a condition to use of the public right of

2   way under a state franchise."  (Id.)

3           The court is not convinced by Comcast's argument.  The

4   Section 621 Order was addressing the issue of whether Comcast

5   should have to obtain a second franchise and pay the franchise

6   fee again due to its status as a telecommunications provider

7   after already paying one based on its status as a cable operator

8   in City of Eugene v. Comcast of Oregon II, Inc., 359 Or. 528

9   (2016).  The Section 621 Order also mentioned in a footnote that

10  many commenters had specifically asked about DIVCA and its annual

11  "administrative fee" in addition to the five percent franchise

12  fees imposed, and cited this court's previous opinion where it

13  found that the CPUC User Fee was a fee of "general

14  applicability."  See Section 621 Order, 34 FCC Rcd. 6844 at ¶ 117

15  n. 431.  Despite being given this opportunity to weigh in on

16  whether the various fees in DIVCA violated the Federal Cable

17  Act's five percent franchise fee cap, the FCC "decline[d]. . . to

18  opine on the application of the Cable Act to specific state laws"

19  and noted that these concerns are "largely settled by section

20  622, which excludes any tax, fee, or assessment of general

21  applicability from the definition of franchise fees."  Id. at ¶

22  117.

23          Notwithstanding the Section 621 Order, the court

24  concludes that the CPUC User Fee is a fee of general

25  applicability.[6]  The CPUC User Fee is not a fee imposed solely on

26  _____

27          [6]    Comcast has not contended that the CPUC fee is unduly
    discriminatory toward cable operators, nor can it do so, because
    it does not apply solely to cable operators.  See Time Warner,
28  2013 WL 12126774 at *2.

cable companies or other video franchise holders "in exchange for the cable operator's right to access and use the rights-of-way." Id. at ¶ 89.  Rather, the CPUC User Fee is a way for the CPUC to recover its regulatory costs associated with DIVCA.  See Cal. Pub. Util. Code § 441.  The CPUC imposes similar annual user fees on "every electrical, gas, telephone, telegraph, water, sewer system, and heat corporation."  See Cal. Pub. Util. Code § 431.[7] Although the court recognizes that Comcast is not a public utility, the fact that the CPUC charges these annual user fees to virtually all the utilities and cable franchise holders within its jurisdiction lends further credence to the argument that the CPUC User Fee is a "fee of general applicability" under section 542(g)(2).  Indeed, the fact that these CPUC annual user fees are assessed against virtually all public utilities in California seems to satisfy the FCC's admonition in the Section 621 Order that the validity of generally applicable taxes "must be shown, at least in part, by their application to broader classes of entities or citizens beyond providers of cable and non-cable communications services."  See Section 621 Order, 34 FCC Rcd. 6844 at ¶ 92.

For the reasons stated above, the court finds as a matter of law that the CPUC User Fee is a "fee. . . of general

[7]    At oral argument, Comcast argued at length that the CPUC fee imposed on utility companies, see Cal. Pub. Util. Code § 431, is distinguishable from the CPUC User Fee at issue here because they were promulgated by different statutes, historically calculated differently, and pay for different expenses within the CPUC.  Although the court recognizes these distinctions, they do not change the court's analysis.

applicability", and is not a "franchise fee" within the meaning of 47 U.S.C. § 542.[8]  Accordingly, the court will grant SMCTC summary judgment on this claim.

C.    Tower Rental Fees

Under Cal. Pub. Util. Code § 5860, "gross revenue" means "all revenue actually received by the holder of a state franchise. . . that is derived from the operation of the holder's network to provide cable or video service within the jurisdiction of the local entity. . ."  See Cal. Pub. Util. Code § 5860(d). Comcast leases available space on its communications towers to third parties, such as wireless carriers.  (Pl.'s Resp. to Def.'s SUF at ¶ 28.)  The parties disagree as to whether, as a matter of law, these tower rental fees should be included in "gross revenue" for the purpose of calculating franchise and PEG fees. (Def.'s Mot. for Summ. J. at 23.)

Comcast contends that tower rental fees are not part of its cable or video service within the jurisdiction of SMCTC because the lessees are third parties who do not use the towers to provide any cable or video service to subscribers.  (Def.'s Reply in Supp. of Mot. for Summ. J. at 13.) (Docket No. 56.) SMCTC argues that the tower rental fees should be included in the calculation of Comcast's "gross revenue" because, in addition to leasing space on the tower, Comcast uses the towers to provide video services to its subscribers and is "obtaining additional revenues by virtue of that operation."  (Pl.'s Opp'n to Def's

---

[8]    Because the court finds that the CPUC User Fee is a fee of general applicability, the court need not decide whether the Section 621 order applies retroactively or not.

1  Mot. for Summ. J.) (Docket No. 54.)

2         In the court's view, the leasing of tower space to

3  third party users does not fall within the definition of "gross

4  revenue" under Cal. Pub. Util. Code § 5860(d).  Comcast's tower

5  rental fees are not derived from the operation of the towers to

6  provide cable or video service within the jurisdiction; rather,

7  the tower rental fees are derived from the leasing of facilities

8  for third-party users.  (Def.'s Mot. for Summ. J. at 23.)  If

9  Comcast were to cease using its towers for the provision of cable

10  and video services to subscribers, it would presumably have no

11  effect on its ability to rent space on these towers to third

12  parties.  The fees generated do not depend on Comcast's operation

13  of the towers to provide video and cable service to its

14  subscribers, but on the physical existence of the tower.

15         Moreover, the Federal Cable Act forecloses including

16  the tower rental fees in the calculation of "gross revenue" for

17  purposes of calculating franchise fees.  Under the Federal Cable

18  Act, "the franchise fees paid by a cable operator with respect to

19  any cable system shall not exceed 5 percent of such cable

20  operator's gross revenues derived in such period from the

21  operation of the cable system to provide cable services."  See 47

22  U.S.C. § 542(b).  The FCC has clarified that the franchise fee

23  "only applies to revenue obtained from 'cable services,' not non-

24  cable services that Congress understood could provide additional

25  sources of revenue."  See Section 621 Order, 34 FCC Rcd. 6844 at

26  ¶ 89.

27         Accordingly, the court concludes as a matter of law

28  that the tower rental fees should not be included as "gross

1 revenue" for cable services for the purpose of calculating

2 franchise and PEG fees under both California Public Utility Code

3 § 5860(d) and the Federal Cable Act.  Comcast is therefore

4 entitled to summary judgment on this claim.

5         D.   <u>Multi-Service Fees</u>

6         Section 542(b) of the Cable Act establishes a uniform

7 federal policy which limits franchise fees to five percent of a

8 cable operator's annual revenues from cable services only.  <u>See</u>

9 47 U.S.C. § 542(b).  DIVCA, in keeping with the Federal Cable

10 Act, likewise specifies that the state franchise fee shall be

11 applied only to the "gross revenue" attributable to video

12 service.  <u>See</u> Cal. Pub. Util. Code § 5860(f).  "Gross revenue" is

13 defined as "all revenue actually received by the holder of a

14 state franchise, as determined in accordance with generally

15 accepted accounting principles ("GAAP"). . ."  <u>See</u> Cal. Pub.

16 Util. Code § 5860(d).

17         Comcast offers multiple services, such as cable,

18 internet, telephone, and home security monitoring, that customers

19 can purchase individually or in multi-product packages called

20 "bundles."  (Pl.'s Resp. to Def.'s SUF at ¶ 20.)  Bundles allow

21 customers to purchase multiple services at a discount compared to

22 the sum of the stand-alone prices for those services when

23 purchased individually.  (<u>Id.</u> at 21.)  Comcast has established

24 various additional "multi-service" fees that apply to its

25 bundles, including late fees, early termination fees, and whole

26 house maintenance fees.  (Def.'s SUF at ¶ 21.)  Comcast claims

27 that because of the federal mandate that franchise fees can only

28 be charged on a cable operator's cable service, it allocates

1   revenues from its multiservice fees to isolate the portion

2   attributable to cable service in calculating franchise fee

3   payments.  (Def.'s Mot. for Summ. J. at 17.)  Comcast argues that

4   it has correctly allocated the portion of multiservice fees

5   attributable to cable service revenues in calculating its

6   franchise and PEG fees pursuant to GAAP.  (See Def.'s Mot. for

7   Summ. J. at 18.)  SMCTC disagrees and argues that Comcast's

8   methodology regarding the allocation of multi-service fees is

9   inconsistent with GAAP and incorrectly allocated.  (See Pl.'s

10  Opp'n to Def.'s Mot. for Summ. J. at 17–25.)

11          In its motion for summary judgment, Comcast addresses

12  many multi-service fees: specifically, late fees, not sufficient

13  fund fees, convenience fees (for payment over the telephone),

14  early termination fees, whole house maintenance fees, and video

15  activation/installation credits to customers.  (Def's Mot. for

16  Summ. J. at 16–17.)  However, although Comcast moves for summary

17  judgment on all multi-service fees, it failed to identify and

18  address each multi-service fee at issue in its initial motion for

19  summary judgment, such as billing and collection fees and write-

20  offs and recoveries, (See Pl.'s Opp'n to Def's Mot. for Summ. J.

21  at 18.), and addresses them only in a cursory manner in its

22  Reply.  (Def.'s Reply in Supp. of Mot. for Summ. J. at 14, 18.)

23          Most critically, however, Comcast has not demonstrated

24  to the court that the methodology it uses in allocating the

25  revenues for each multi-service fee at issue actually complies

26  with DIVCA and GAAP.  Deposition excerpts that Comcast cites for

27  the proposition that its allocations comply with GAAP merely show

28  that Comcast's Vice President of Finance and Accounting, Jeff

1   Aldi, believes "that GAAP . . . requires the allocation of the

2   late fee or the multi-service fees to the component units of

3   accounting."  (See Decl. of Edward Seidel at Ex. 10, attaching

4   excerpts from the transcript of the August 26, 2020 Dep. of Jeff

5   Aldi at pp. 108:3–109:12; 110:11–111:13) (Docket No. 45).)  A

6   simple belief by Comcast's executive is insufficient to prove

7   that Comcast's practices in allocating multi-service fees

8   actually comply with GAAP.

9        Moreover, other testimony casts doubt upon Mr. Aldi's

10   belief that Comcast's methodology in fact complies with GAAP.

11   Mr. Aldi stated that he does not review the calculations relative

12   to the determination of franchise fees to ensure that they were

13   performed in accordance with GAAP.  (See Decl. of Mark Velasquez

14   at Ex. D, attaching excerpts from the transcript of the August

15   26, 2020 Dep. of Jeff Aldi at 96:2–15) (Docket No. 54-1).)

16   Additionally, SMCTC submits that the two other franchise holders

17   within SMCTC's jurisdiction, who are also required to apply GAAP,

18   allocate similar multi-service fees differently.  (Pl.'s Opp'n.

19   to Def.'s Mot. for Summ. J. at 23.)

20        After reviewing all the evidence in the record, the

21   court concludes that there is a genuine issue of material fact as

22   to whether Comcast's allocation of multi-service fees is

23   appropriate and complies with GAAP and DIVCA.  Accordingly, the

24   court will deny Comcast's motion for summary judgment on this

25   claim.

26        E.   Launch Incentives

27        The court next addresses the parties' contentions as to

28   whether "launch incentives" constitute "gross revenue" pursuant

1  to Cal. Pub. Util. Code § 5860(d). [9]  Comcast and other cable

2  operators typically pay programmers for content and then package

3  and distribute that content to subscribers.  (Pl.'s Resp. to

4  Def.'s SUF at ¶ 24.)  However, in order to sell their content to

5  a cable operator, programmers will sometimes pay certain "launch

6  incentives" to the operator.  (Id.)  "Launch incentives" are

7  typically paid up front to the cable operator as part of a

8  content agreement.  (Id.)  Comcast amortizes these "launch

9  incentives" over the life of its contract with the programmer and

10  contends that this effectively lowers the negotiated price a

11  cable operator pays for the content.  (Def.'s Mot. for Summ. J.

12  at 20.)

13       Comcast argues that because "launch incentives" reduce

14  Comcast's costs for programming, they do not constitute "gross

15  revenue" for the purpose of calculating franchise and PEG fees.

16  (Id.)  SMCTC disagrees, and argues that under DIVCA, "gross

17  revenue" is all revenue unless excluded.  (Pl.'s Opp'n. to Def.'s

18  Mot. for Summ. J. at 34.)  Cal. Pub. Util. Code § 5680(e)(9)

19  provides an exclusion from gross revenue for "revenue received as

20  reimbursement by programmers of a specific, identifiable

21  marketing costs incurred by the holder of a state franchise for

22  the introduction of new programming."  SMCTC contends that

23  "launch incentives" count as "gross revenue" unless they

24  specifically fall into this exception under §5680(e)(9).  (Pl.'s

25  Opp'n. to Def.'s Mot. for Summ. J. at 34.)

26  ─────────────────
27       [9]  As defined supra at p.20, "gross revenue" under DIVCA
     means all revenue actually received by the holder of a state
     franchise, as determined in accordance with GAAP.  See Cal. Pub.
28  Util. Code § 5860(d).

A provision of GAAP, Accounting Standards Codification ("A.S.C.") 605-50-45-12, provides that "cash consideration received by a customer from a vendor is presumed to be a reduction of the prices of the vendor's products or services . . . [and] shall be characterized as a reduction of cost of sales when recognized in the customer's income statement." See Financial Accounting Standards Board, A.S.C. at 605-50-45-12. Comcast cites this provision, and argues that this signifies that "launch incentives" received from the programmer (the "vendor") constitute a reduction of the purchase price of the programming for cable operators (the "customer"), and therefore do not constitute "gross revenue" under DIVCA. (Def.'s Mot. for Summ. J. at 21.)

SMCTC disagrees and points to a different provision of GAAP that details when certain activities that Comcast may classify as "launch incentives" would actually constitute "gross revenue" under DIVCA. (Pl.'s Opp'n. to Def.'s Mot. for Summ. J. at 35.)  A.S.C. 607-50-45-13 states that the presumption that cash consideration received by a customer (i.e. Comcast) from a vendor (i.e. the programmer) constitutes a reduction of the prices of the vendor's products or services is overcome, and the consideration should be considered revenue, when "[the consideration represents] a payment for assets or services delivered to the vendor. . ."  See A.S.C. at 605-50-45-13.  SMCTC contends that activities like television ads, bill inserts, channel position, or local media ads are all examples of activities that would constitute revenue if cash consideration were received from the programmer.  (Decl. of Mark Velasquez at

1    Ex. F, attaching Garth Ashpaugh's Expert Report at 7.) (Docket

2    No. 54-1.)

3            The court has not been provided detailed information as

4    to what activities Comcast includes within the category of

5    "launch incentives."  Moreover, it is clear that the parties have

6    dueling interpretations of which GAAP provisions are applicable

7    and which activities those GAAP provisions encompass.

8    Accordingly, there is a genuine issue of material fact as to

9    whether Comcast should exclude launch incentives from the

10   definition of "gross revenue" under Cal. Pub. Util. Code §

11   5860(d) and the court will deny Comcast's motion for summary

12   judgment on this claim.

13       F.   Customer Credits for Missed Installations/Appointments

14           Under DIVCA, gross revenue is defined as "all revenue

15   actually received by the holder of a state franchise . . . . as

16   determined in accordance with generally accepted accounting

17   principles, that is derived from the operation of the holder's

18   network to provide cable or video service. . ."  Cal. Pub. Util.

19   Code § 5860(d).  Comcast subscribers receive credits on their

20   bills if a Comcast technician is late or fails to show up to an

21   activation or installation appointment.  (Pl.'s Resp. to Def.'s

22   SUF at ¶ 26.)  SMCTC contends that these credits should be

23   included as "gross revenue" in calculating franchise and PEG

24   fees.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 28.)  Comcast

25   argues that these customer credits do not count as "gross

26   revenue" under Section 5860(d) because Comcast does not actually

27   receive revenue from the credits it provides to customers;

28   rather, a customer credit is a reduction in the revenue received.

1   (Def.'s Mot. for Summ. J. at 22.)

2         SMCTC's argument is unpersuasive.  SMCTC recognizes

3   that DIVCA excludes from gross revenue "[a]mounts not actually

4   received, even if billed, such as bad debt; refunds, rebates, or

5   discounts to subscribers or other third parties; or revenue

6   imputed from the provision of cable services for free or at

7   reduced rates."  See Cal. Pub. Util. Code § 5860(e)(1).  However,

8   SMCTC contends that if Comcast were allowed to exclude credits to

9   customers from the definition of "gross revenue", it would allow

10  Comcast to push a portion of its costs for untimely business

11  practices onto SMCTC.  (Pl.'s Opp'n. to Def.'s Mot. for Summ. J.

12  at 28.)  SMCTC's belief that such a practice would be unfair is

13  unavailing; the plain language of DIVCA limits "gross revenue" to

14  amounts actually received, and Comcast does not receive any

15  revenue for the customer credits that it provides to customers

16  for missed appointments or installations.

17        The court therefore concludes as a matter of law that

18  customer credits for missed installations or appointments do not

19  constitute "gross revenue" under DIVCA for purposes of

20  calculating franchise and PEG fees, and will grant Comcast

21  summary judgment on this claim.

22      G.   Comcast's Unilateral Deductions Prior to Payment of

23           Franchise and PEG Fees to SMCTC

24        Section 555a(a) of the Federal Cable Act states that in

25  any court proceeding "involving a claim against a franchising

26  authority or other governmental entity. . . arising from the

27  regulation of cable service. . . any relief . . . shall be

28  limited to injunctive relief and declaratory relief."  47 U.S.C.

1  § 555a(a).  SMCTC contends that this provision prevents Comcast

2  from engaging in self-help and adjusting its payments of

3  franchise fees and PEG fees before paying SMCTC.  (Pl.'s Mot. for

4  Summ. J. at 16.)  SMCTC argues that "because Comcast deducts (or

5  takes out the amount rightfully due to SMCTC in advance) before a

6  determination whether such actions are appropriate", SMCTC is

7  forced to resort to litigation to collect underpayments.  (See

8  Pl.'s Reply in Supp. of Mot. for Summ. J.  at 10.) (Docket No.

9  57.)  Comcast contends that Section 555a(a) does not apply here

10 because SMCTC initiated this lawsuit against Comcast.  (Def.'s

11 Mot. in Opp'n to Pl.'s Mot. for Summ. J. at 7.)  Accordingly, the

12 court must address whether Comcast is barred from unilaterally

13 adjusting its payments of franchise fees and PEG fees before

14 paying SMCTC, notwithstanding the court's ruling on whether

15 certain categories of fees constitute "gross revenue" or are

16 "franchise fees".  (Pl.'s Mot. for Summ. J. at 16.)

17       SMCTC relies on Glendale v. Marcus Cable Associates,

18 LLC, 231 Cal. App. 4th 1359, 1377 (2nd Dist. 2014), to support

19 its proposition that Section 555a(a) bars Comcast's deductions of

20 franchise and PEG fees prior to paying SMCTC.  In Glendale, the

21 cable operator initially sought monetary damages and then,

22 confronted with the franchising authority's Section 555a(a)

23 defense, deleted its express request for damages and

24 reimbursements and replaced it with a request for a declaration

25 that it had a future right of offset based on past overcharges of

26 PEG fees.  Glendale, 231 Cal. App. 4th at 1378.  The court

27 declared that this was "merely a pleading artifice designed to

28 circumvent the damage prohibition in section 555a(a) of the

28

1  Federal Cable Act."  <u>Id.</u>

2          SMCTC argues that Comcast's actions are likewise a

3  "ruse designed to obtain a monetary award in contravention of

4  Section 555a(a)."  (Pl.'s Mot. for Summ. J. at 3.)  However, the

5  thrust of the case in <u>Glendale</u> was that the cable operator sought

6  to recover money that it had already paid to the franchising

7  authority.  <u>Glendale</u> is distinguishable because the procedural

8  posture here is the reverse; SMCTC is the party bringing suit

9  against Comcast and Comcast has not sought damages against SMCTC.

10          <u>SMCTC II</u>, 923 F.3d 1163, 1165 (9th Cir. 2019), likewise

11  offers little support for SMCTC's position.  In <u>SMCTC II</u>, Comcast

12  sought monetary damages for SMCTC's alleged conversion of its

13  security deposit.  <u>See</u> <u>SMCTC II,</u> 923 F.3d at 1167.  The Ninth

14  Circuit held that this was barred by Section 555a(a).  <u>Id.</u> at

15  1171.  However, the Ninth Circuit emphasized that it had not

16  "considered whether [section 555a(a)] would apply were Comcast

17  <u>defending</u> a suit for underpayment of franchise fees brought by

18  SMCTC as would likely occur were Comcast to deduct the deposit as

19  an overpayment from its franchise fee payments. . . instead of

20  bringing suit for damages."  <u>Id.</u> at 1172 (emphasis added).  It is

21  precisely this procedural posture, which the Ninth Circuit

22  expressly did not consider, which is at issue here.

23          Moreover, in the recent <u>Section 621 Order</u>, the FCC

24  seems to contemplate that cable providers should take certain

25  offsets or reductions to franchise fees to ensure compliance with

26  the federal 5% cap of franchise fees.  <u>See</u> <u>Section 621 Order</u>, 34

27  FCC Rcd. 6844 at ¶ 111 n.416 (stating that "non-capital costs of

28  PEG requirements must be offset from the cable operator's

1    franchise fee payments.")  This position by the FCC lends support

2    to Comcast's argument that these offsets or reductions do not

3    violate 47 U.S.C. § 555a(a).

4         SMCTC additionally argues that Comcast's unilateral

5    deductions from its franchise fees and PEG fees are barred under

6    DIVCA because they violate California Public Utilities Code §

7    5860(h).  Under this provision, the state franchise fee shall be

8    remitted quarterly to the applicable local entity, with a summary

9    explaining the basis for the calculation of the state franchise

10   fee.  See Cal. Pub. Util. Code § 5860(h).  Section 5680(h)

11   further states that "[i]f the holder has overpaid the franchise

12   fee, it may deduct the overpayment from its next quarterly

13   payment."  Id.  SMCTC contends that this provision stands for the

14   proposition that cable operators cannot make any deductions

15   except for past overpayments.  (Pl.'s Mot. for Summ. J. at 17.)

16        The court disagrees.  Cal. Pub. Util. Code § 5680(h)

17   does not address the adjustment of payments required to comply

18   with the Federal Cable Act's 5% cap on franchise fee payments

19   whatsoever nor does it explicitly bar deductions by cable

20   operators except for past overpayments.  Moreover, as addressed

21   above, the FCC contemplates that franchise authorities and cable

22   operators must make offsets or reductions to franchise fees in

23   order to comply with the federal 5% cap on franchise fees laid

24   out in 47 U.S.C. § 542 and relevant FCC requirements.  See

25   Section 621 Order, 34 FCC Rcd. 6844 at ¶ 111 n. 416 (stating that

26   "non-capital costs of PEG requirements must be offset from the

27   cable operator's franchise fee payments."); id. at ¶ 63 n. 251

28   (holding that franchising authorities cannot ask cable operators

1    to "voluntarily waive the cap and accede to making payments or

2    contributions that are not offset against the statutory limit on

3    franchise fees.")  Because California Public Utilities Code §

4    5860(h) does not state that the only deductions permitted by

5    cable operators are deductions for past overpayments of fees by

6    the provider, the court declines to read such a prohibition into

7    the statute.

8         Accordingly, the court does not find that SMCTC has met

9    its burden to demonstrate that Comcast's deductions and offsets

10   prior to its payment of franchise and PEG fees to SMCTC violates

11   either 47 U.S.C. § 555a(a) or Cal. Pub. Util. Code § 5680(h) and

12   will deny SMCTC summary judgment on this claim.

13        IT IS THEREFORE ORDERED that Comcast's motion for

14   summary judgment (Docket No. 42; Docket No. 34.) be, and the same

15   hereby is, GRANTED in part.  Comcast is entitled to summary

16   judgment on its claim that PEG fees should not be included as

17   "gross revenue" for the purpose of calculating franchise fees,

18   and its claims that tower rental fees and customer credits for

19   missed installations or appointments should not be included as

20   "gross revenue" for the purpose of calculating franchise fees and

21   PEG fees.  Comcast's motion for summary judgment is DENIED as to

22   all other claims.

23        IT IS FURTHER ORDERED that SMCTC's motion for partial

24   summary judgment (Docket No. 49; Docket No. 41.) be, and the same

25   hereby is, GRANTED in part.  SMCTC is entitled to summary

26   judgment on its claim that CPUC fees are not "franchise fees"

27   under the Federal Cable Act.  SMCTC's motion for summary judgment

28   is DENIED as to all other claims.

Dated:   December 18, 2020

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE